**Richard CAPPS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–9011–CR–679.[1]**

Court of Appeals of Indiana,
Fifth District.

June 17, 1991.

---

1. This case has been diverted to this office by order of the Chief Judge.

George K. Shields, Indianapolis, for appellant-defendant.

Linley E. Pearson, State Atty. Gen. and Gary Damon Secrest, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee-plaintiff.

BARTEAU, Judge.

Richard Capps appeals from jury verdicts of guilty on two counts of murder. His defense was insanity. The issue on appeal is sufficiency of the evidence, particularly whether the prosecution proved beyond a reasonable doubt that Capps killed his victims "knowingly or intentionally."[2] We affirm.

## BACKGROUND

Before dawn on November 17, 1988 the bodies of Roland and Margaret Capps, married, both aged sixty, were found lying in the street in front of their house on Buick Drive in Speedway. They had been shot to death. A trail through the autumn leaves covering the lawn and bloodstains on the front porch indicated that the bodies had been dragged into the street from within the house. When an officer dialed the Capps' home telephone number, their twenty-three year old son Richard answered. He said he was the only person in the house. Shortly thereafter, he came out and was arrested. While being handcuffed, he stated that he was Jesus Christ, that his parents were evil and had tried to kill him, and that he was ridding the world of evil. The murder weapon and spent shells were found inside the house, as well as bloodstains suggesting that the shootings had taken place there, after which the bodies had been dragged out to the street.

After a defense motion for mental examination, the court in February, 1989 appointed two psychiatrists, Nie and Schuster. Both found Capps incompetent to stand trial. As to culpability, Nie wrote "whether [Capps] was psychotic at the time of the alleged crime is uncertain at this point though I strongly suspect that he was insane at the time of the act"; Schuster opined that "Capps was probably of unsound mind at the time of the alleged offense but [reserved] final opinion [pending] opportunity to examine him when he is less delusional. . . ." Record at 39, 43. Capps was then transferred to the Logansport State Hospital, where he was treated with anti-psychosis drugs. In July, 1989 both psychiatrists found that Capps understood the nature of the charges against him and was capable of assisting in his defense.

**2.** Ind.Code 35–42–1–1(1).

They testified to that effect in a hearing in October, 1989 whereupon the court found Capps competent to stand trial.

At trial in March, 1990 Capps interposed the defense of insanity through witness Strefling, a psychiatrist from Logansport State Hospital, who testified that Capps suffered from schizoaffective disorder, paranoid delusions and auditory hallucinations. Thereafter, the court pursuant to the procedure in Ind.Code 35–36–2–2 examined psychiatrists Nie and Schuster, both of whom were then cross-examined by both the state and the defense. Nie reiterated his opinion of uncertainty, but nevertheless strong suspicion that Capps was insane at the time of the killings. Schuster, who had reserved an opinion on Capps' state of mind, testified that during the July 1989 examination Capps was less delusional than during February 1989. Accordingly, when the court asked "[D]id you reach a conclusion or an opinion as to the status of his mind from the legal sense on or about the date of the alleged events?",[3] Schuster answered unequivocally that "Richard Capps was of unsound mind on or about November 16th, 1988 as a result of a drug-related psychotic state." Record at 827.

The prosecution called rebuttal witnesses, including Capps' older brother and eight current or former neighbors of the Capps family. None of the rebuttal witnesses had ever heard Capps claim to be Jesus. The prosecutor elicited opinions that Capps was a bully, a troublemaker who knew right from wrong, and who was not insane but was capable of feigning insanity to evade culpability. Paul Kash, a former friend of Capps', testified that six to eight weeks before the killings, he had arrived at the Capps' home just as the defendant came out of the house, angrily stating that he would kill his parents and put them in the trash. Kash also testified that he and Capps had at least three conversations concerning insanity as a means of avoiding criminal responsibility, and that at least one of the conversations occurred within two to six months before November, 1988.

Capps' brother Michael testified that he once had to lock himself in the bathroom, having been chased there by an angry, knife-wielding Richard, who then stabbed the knife through the hollow-core bathroom door. On another occasion, testified Michael, Richard had actually fired a shotgun at him, aiming high. Michael Capps also testified that while sorting through the house after the shooting of his parents, he found in the defendant's dresser drawer a plastic sandwich bag containing a receipt showing that the defendant had purchased the murder weapon less than a month before the killings and a cartoon torn from a newspaper, depicting a lawyer advising a prisoner that "Our defense will be that no one would be stupid enough to do what you did."

The state's final rebuttal witness was Detective Roney, who took charge of the investigation following the arrest of Capps. Roney testified that Capps abandoned his claims to be Jesus when Roney told him to "cut the bullshit." Record at 1159. Roney also testified that when he interviewed Capps during the afternoon of November 17, 1988, Capps seemed to be in control of himself, in both speech and action.

## DISCUSSION

■ Both parties have cited *Rogers v. State* (1987), Ind., 514 N.E.2d 1259. In *Rogers*, the appellant had been convicted of felony murder, despite the testimony of a court-appointed psychiatrist who told the jury that Rogers was a paranoid schizophrenic and insane at the time of the kill-

---

**3.** I.C. 35–41–3–6 defines "mental disease or defect":

(a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

(b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

ing. However, an appointed clinical psychologist testified that Rogers was not insane at the time of the crime, and a lay witness testified that Rogers had not been acting "crazy." The supreme court explained how courts of review should resolve appeals based on such conflicts in evidence:

> The defendant has the burden to establish the defense of insanity by a preponderance of the evidence. A convicted defendant who claims his insanity defense should have prevailed at trial is in the position of one appealing from a negative judgment. We will reverse only when the evidence is without conflict and leads to but one conclusion which the trier of fact did not reach.
>
> . . . .
>
> . . . Lay testimony about the accused's conduct at the time of the crime may be considered together with expert testimony when determining whether to hold a person responsible for his acts. The jury may reject psychiatric testimony indicating the defendant was insane and rely upon lay testimony that the defendant was sane.

*Rogers*, 514 N.E.2d at 1260–61 (citations deleted).

In contrast to *Rogers*, where there was a conflict between the experts, with weak lay testimony added to the "not insane" side of the balance, here all the expert testimony pressed on the "insane" side of the balance, but there was strong lay testimony to the contrary. This is, however, merely a distinction without a difference. Here, the jury chose to credit the lay testimony that Capps was sane, thereby rejecting the contrary testimony of the psychiatrists. To do so was the jury's prerogative under *Rogers*.

■ The second paragraph quoted above from *Rogers* states that lay testimony regarding the defendant's conduct "at the time of the crime" may be considered together with expert testimony. In *Rogers*, the lay witness was an eyewitness to the crime. In contrast, a substantial part of the lay testimony here was remote from November 17, 1988—Capps' neighbors testified about their unfavorable impressions of him during his childhood.

Nevertheless, we do not read *Rogers* to limit lay testimony on sanity to that which is precisely contemporaneous with the act charged. Such a constriction would unnecessarily limit the state's rebuttal of an insanity defense to eyewitnesses. The better approach allows some temporal distance between the criminal act and the defendant's conduct testified to by a lay witness, and the greater the relevance of the testimony toward the defendant's criminal responsibility, then the greater the allowable time lapse becomes. For example, testimony similar to that of Paul Kash, that a witness and a defendant had discussed feigned insanity as a ploy to evade responsibility for a crime certainly should be weighed by a jury, although the conversation took place several months before the crime. The foregoing analysis conforms *Rogers* to another rule on rebuttal of the insanity defense, that "[a] plea of insanity opens up all the defendant's life for examination." *Coble v. State* (1985), Ind., 476 N.E.2d 102, 106.

In any event, the testimony of Detective Roney described Capps' conduct close in time to the crime, and gave the jury evidence on which to rely in rejecting the psychiatric assessment of Capps' ability to appreciate the wrongfulness of his conduct at the time he acted. It cannot be said that the evidence on Capps' sanity was without conflict and led to but one conclusion, a conclusion other than that reached by the jury. Therefore, the jury's verdict will not be reversed.

AFFIRMED.

RATLIFF, C.J., and RUCKER, J., concur.